IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
ENTERED

MAY 0 4 2000

MICHAEL N. MILBY, CLERK OF COURT

| | | |
|---|---|---|
| NOVELL, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-97-2326 |
| | § | |
| CPU DISTRIBUTING, INC., *et al.*, | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This computer program distribution case is before the Court on the Motion for Summary Judgment ("Defendants' Motion") [Doc. # 102] filed by Defendants CPU Distributing, Inc. ("CPU"), Terry L. Green, and Leroy Hunter, and on Plaintiff's Motion for Summary Judgment on its claims and on Defendants' affirmative defenses ("Plaintiff's Motion") [Doc. # 105].[1] Plaintiff Novell, Inc. ("Novell") filed its Response to Defendants' Motion [Doc. # 113], and Defendants filed a Reply [Doc. # 122].[2] The Court has reviewed the full record in this case, including the parties' memoranda and voluminous evidence.

---

[1]  In this Memorandum and Order, the Court addresses all issues which relate to Plaintiff's causes of action against Defendants. Plaintiff seeks summary judgment on certain of its own causes of action against Defendants and on Defendants' affirmative defenses, raising the same issues raised in Defendants' Motion. Because Plaintiff's Motion in these two areas is in effect a cross-motion to Defendants' Motion as to Plaintiff's claims, the Court will refer to the cross-motions as "Defendants' Motion" unless referring specifically to Plaintiff's Motion.

Also included in Plaintiff's Motion is Novell's request for summary judgment on Defendants' counterclaims. The counterclaim issues will be addressed promptly in a separate Memorandum and Order.

[2]  Novell subsequently filed a Motion for Leave to File Surreply [Doc. # 124], which is accompanied by Novell's proposed Surreply. The Court grants the requested leave and accepts the Surreply as properly before the Court. The Court has considered the Surreply in reaching its decision on Defendants' Motion.

130

Based on this review and the application of relevant legal authorities, the Court concludes that the Motions should be granted in part and denied in part, as explained below.

## I.  **BACKGROUND**

Novell is a manufacturer of network software products, such as NetWare, in which Novell enjoys both copyright and trademark rights.  Novell distributes its software both individually and through original equipment manufacturers ("OEMs") who usually combine or "bundle" the software with other hardware or software products for resale.  The OEMs are required to sign the "Novell, Inc. Composite Signature Agreement for Novell Authorized OEMs" ("OEM Agreement").

CPU is a distributor of computer network hardware and software products, but is not an OEM.  CPU generally sells to other distributors and resellers, not to end users.  It is undisputed that CPU has resold copies of Novell software.  Novell alleges that CPU's sales constitute trademark and copyright infringement.  CPU argues that it bought the Novell software from OEMs and that its resales were authorized as a matter of law and/or as a matter of fact.

Novell sued CPU and two CPU agents, Terry Green and Leroy Hunter.  Novell asserted causes of action for copyright infringement, trademark infringement both by reselling Novell software and by using Novell logos and marks in advertising, deceptive trade practices in violation of the Lanham Act, unjust enrichment, and contributory infringement against the individual defendants.  In its Response, Novell stated that "[t]o the extent that Defendants have also distributed *bundled* OEM products acquired from a Novell OEM according to those [OEM] agreements, that conduct is not in issue here."  Response, at 2-3

(emphasis in original). Instead, according to Novell's Response, this "case is about the unauthorized distribution of upgrade product obtained through the distributor channel and the distribution of unbundled OEM product obtained through the OEM channel." *Id.* at 3. Novell also alleges that CPU marketed a counterfeit copy of Novell software.

After a lengthy period of discovery, the parties filed their Motions. The parties have submitted thorough briefs and extensive evidence in support of their positions. The Motions are now ripe for decision.

## II.  SUMMARY JUDGMENT STANDARD

The United States Supreme Court has held that a motion for summary judgment is properly granted unless there is evidence "on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . .." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Wheeler v. Miller*, 168 F.3d 241, 247 (5th Cir. 1999). Rule 56 is an integral part of the Federal Rules of Civil Procedure, recognizing a party's right to demonstrate that certain claims have no factual basis and to have those unsupported claims disposed of prior to trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Once the movant shows that there are no genuine issues of material fact, the burden is on the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact warranting a trial. *Texas Manufactured Housing Ass'n v. Nederland*, 101 F.3d 1095, 1099 (5th Cir. 1996), *cert. denied*, 521 U.S. 1112 (1997). The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions,

metaphysical doubt as to the facts, or a scintilla of evidence. *Doe v. Dallas Independent School Dist.*, 153 F.3d 211, 215 (5th Cir. 1998); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(*en banc*).

"Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial and continuing the action would be useless." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991). Rumors, speculation, hearsay and other information which would be excluded at trial cannot be considered in ruling on a motion for summary judgment. *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995). Each party has filed numerous objections to the evidence submitted by the opposing party. In deciding the Motions, the Court has not considered evidence which would be inadmissible at trial.[3]

## III.   COPYRIGHT INFRINGEMENT CLAIMS

Novell has a copyright which protects its NetWare products. Novell alleges that CPU's acquisition and distribution of NetWare products constitutes copyright infringement. CPU asserts the "first sale doctrine" as an affirmative defense. Defendants bear the burden

---

[3]   With reference to CPU's objection to the declaration of Carolina Wuergler, the Court agrees that Novell did not designate Wuergler as an expert witness and, as a result, Wuergler cannot present expert testimony. Novell argues that it is not offering expert testimony through Wuergler and, instead, is offering her testimony as a lay opinion under Rule 701 of the Federal Rules of Evidence. Novell asserts that the testing which is the subject of Wuergler's declaration "did not require great scientific or engineering expertise to conduct." *See* Novell's Response to Defendants' Objections [Doc. # 121], at 9. The issue is not relevant for purposes of the summary judgment motion because the Court did not need to rely on Wuergler's declaration. Moreover, the current record is insufficient for the Court to decide whether the proffered evidence requires expert testimony or is an appropriate lay opinion under Rule 701. If Novell intends to offer Wuergler as a witness at trial, and if CPU believes that Wuergler's opinion is not a lay opinion admissible under Rule 701, CPU may file an appropriate pretrial motion and request a hearing.

of proof on the "first sale doctrine." *See Microsoft Corp. v. Harmony Computers &*
*Electronics, Inc.*, 846 F. Supp. 208, 212 (E.D.N.Y. 1994).

## A.  The First Sale Doctrine

The "first sale doctrine" was originally recognized by the United States Supreme
Court in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908).  In that case, publisher Bobbs-
Merrill placed a notice in its books stating that any sale of the book for a retail price under
$1.00 would constitute copyright infringement.[4]  Bobbs-Merrill sold the books to defendants,
the owners of Macy's department store, who disregarded the notice and sold the books at a
lower price without Bobbs-Merrill's consent.  The Supreme Court held that the exclusive
statutory right to "vend" copyrighted works applied only to the first sale of the work in
question.  *Id.* at 349-50.  The Supreme Court in *Bobbs-Merrill* "emphasized the critical
distinction between statutory rights and contract rights." *See Quality King Distributors, Inc.*
*v. L'Anza Research International, Inc.*, 523 U.S. 135, 143 (1998).

The Fifth Circuit later recognized the first sale doctrine.  In *American International*
*Pictures, Inc. v. Foreman*, 576 F.2d 661, 664 (5th Cir. 1978), the Fifth Circuit noted that
"[e]ven if the copyright holder places restrictions on the purchaser in the first sale . . ., the
buyer's disregard of the restrictions on resale does not make the buyer or the person who

---

[4]       Novell argues that the End-User License Agreement ("EULA"), also referred to as a "shrink
wrap license," contained inside each software package requires construction of the OEM
Agreement as a license rather than a sale.  CPU argues that the EULAs are unenforceable.
It is undisputed that the EULA is directed to the end user of the software.  The Court
concludes that whether the EULA is otherwise enforceable or not, it is similar to the notice
included in the books published by Bobbs-Merrill and, as such, does not preclude a finding
that a first sale occurs when Novell delivers the copies of its software to the OEMs.

buys in the secondary market liable for infringement." As stated by the Fifth Circuit, the first sale doctrine "thus extinguishes the copyright holder's ability to control the course of copies placed in the stream of commerce." *Id.*

Since *Foreman*, the "first sale doctrine" has been codified. Currently, § 109(a) of the Copyright Act provides that "the owner of a particular copy . . . lawfully made under this title . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . .." 17 U.S.C. § 109(a). The "first sale doctrine" only permits the owner of the particular copy "to sell or otherwise dispose of the possession of that copy." The "first sale doctrine" does not permit the owner of the particular copy to make additional, unauthorized copies in violation of the copyright owner's rights.

With the exception of a single counterfeit unit,[5] it is undisputed that the copies obtained by CPU were "lawfully made" under the Copyright Act. The "first sale" issue in this case is whether the transfer of copies from Novell to the OEMs is a sale such that the OEMs become the owners of the particular copies they obtain from Novell. If Novell sells the copies to the OEMs, that constitutes the "first sale" of those copies and Novell cannot control subsequent transfers of the copies.[6] If, as Novell argues, it merely licenses the OEMs

---

[5]     CPU denies that it distributed counterfeit copies, but concedes that the "first sale doctrine" cannot apply to a counterfeit unit.

[6]     CPU notes that the United States District Court for the District of Utah rejected a similar "license, not sale" argument asserted by Novell in *Novell, Inc. v. Network Trade Center, Inc.,* 25 F. Supp. 2d 1218 (D. Utah 1997), *vacated in relevant part by* 187 F.R.D. 657 (D. Utah 1999). The Utah court held specifically that the transfers from Novell to its distributors were "sales" and, as a result, the first sale doctrine applied. *Id.* at 1230. The opinion was later vacated as moot at the parties' request following settlement. CPU argues that, notwithstanding the Utah court's subsequent order vacating its decision, the Utah decision
(continued...)

to distribute copies which belong to Novell, the OEMs do not become the owners of the particular copies and the "first sale doctrine" does not apply.

## B.   Legal Standards for Contract Interpretation

The transfer of a product for consideration with a transfer of title and risk of loss generally constitutes a sale. *See, e.g., VWP of America, Inc. v. United States*, 175 F.3d 1327, 1338-39 (Fed. Cir. 1999); *Enercon GmbH v. International Trade Comm.*, 151 F.3d 1376, 1382 (Fed. Cir. 1998) (citing *Black's Law Dictionary* (6th ed. 1990) and *Webster's Third New International Dictionary* 2003 (1986)), *cert. denied*, 526 U.S. 1130 (1999); *Headrick v. Rockwell International Corp.*, 24 F.3d 1272, 1281 (10th Cir. 1994). To determine whether the transfer of copies of Novell software from Novell to its OEMs is a sale, the Court must construe the OEM Agreement between Novell and each of the OEMs. The OEM Agreement provides that it will be "construed in accordance with the laws of the State of Utah . . .." OEM Agreement, Exh. H to Plaintiff's Motion, at ¶ 12(b).

Under Utah law, a contract must be construed according to its plain and ordinary meaning unless it is ambiguous. *See First American Title Insurance Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 836 (Utah 1998). A contract is ambiguous "if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Interwest Construction v. Palmer*, 923 P.2d 1350, 1359 (Utah 1996) (citations omitted). A contract is not necessarily ambiguous simply "because one party seeks

---

[6]    (...continued)
collaterally estops Novell in this case. This Court agrees with much of the Utah court's reasoning and ultimately reaches the same conclusion reached in Utah. Nonetheless, this Court declines to give collateral estoppel effect to the Utah court's vacated decision.

to endow [the contract terms] with a different interpretation according to his or her own interests." *First American*, 966 P.2d at 837. "Rather, the other interpretation proposed must be plausible and reasonable in light of the language used." *Id.*

The Court must "first look to the four corners of the contract itself to determine whether it is ambiguous." *Interwest*, 923 P.2d at 1359; *see also Gardner v. Madsen*, 949 P.2d 785, 789 (Utah 1997). The Court "must attempt to construe the contract so as to 'harmonize and give effect to all of [its] provisions.'" *Dixon v. Pro Image, Inc.*, 987 P.2d 48, 52 (Utah 1999) (quoting *Nielsen v. O'Reilly*, 848 P.2d 664, 665 (Utah 1992)).

Applying these rules of contract interpretation to the provisions of the OEM Agreement as discussed in the following section, the Court concludes that the OEM Agreement is not ambiguous and that it is properly construed according to its plain and ordinary meaning as a contract for the sale of the particular copies transferred from Novell to the OEMs.

## C.    Novell's OEM Agreements

The Court's conclusion that the OEM Agreement is a contract for sale of particular copies of Novell's product flows in part directly from the definitions used by Novell in the standard OEM Agreement it drafted. These definitions include unambiguous sales language. For example, "Bundled Products/Services" is defined as "the combination of the Novell Products and OEM Products/Services that OEM will market and *sell* as a single product offering." OEM Agreement, ¶ 1(a) (emphasis added). "End User" is defined to exclude "an entity which *resells, sells, licenses,* rents or leases Novell Products to other parties in the

regular course of business." *Id.* at ¶ 1(b) (emphasis added). "Novell Products" are defined as products listed in an attached exhibit "that OEM is authorized to market and *sell* under the Agreement." *Id.* at ¶ 1(g) (emphasis added). Downstream distributors are identified as "OEM Authorized *Resellers*." An OEM Authorized Reseller, as defined in the OEM Agreement, is "an entity that (i) acquires Novell Products for *resale* from OEM, (ii) has successfully completed Novell's *Reseller* Authorization Course or an equivalent course approved by Novell and (iii) has at least one person employed, at all times, who is a Certified NetWare Engineer." *Id.* at ¶ 1(i) (emphasis added).

In the Appointment section of the OEM Agreement, "Novell grants OEM a non-exclusive, non-transferable, worldwide license to market Novell Products to . . . OEM Authorized *Resellers* acquiring Bundled Products/Services solely for *resale* in the ordinary course of business." *Id.* at ¶ 3(a) (emphasis added). Again, Novell used sales language in the OEM Agreement.

The Products and Prices section of the OEM Agreement also supports the Court's construction of the OEM Agreement as a sales contract. Under this section, the "OEM may **acquire** Novell Products under the Agreement at the price listed in Novell's general price list," less a discount. *Id.* at ¶ 4(b) (emphasis added). The OEMs, therefore, pay the general purchase price of the Novell software, with only a discount which can be increased or decreased by Novell at any time. *Id.* Additionally, the OEM is required to pay the applicable *sales* taxes, *id.* at ¶ 4(c) (emphasis added), and the OEM has limited price

protection for copies "acquired by OEM from Novell within sixty (60) days before the price decrease and not yet *sold* or under a contract for *sale* . . .." *Id.* at ¶ 4(f) (emphasis added).

Under the section entitled "Financial Information and Payment Terms," the OEM is required "to pay for Novell Products it orders" and is charged interest on invoices not paid when due. *Id.* at ¶ 6(a). This language requires the OEM to give consideration for the transfer of the copies, which as discussed above is a discounted purchase price for the copies. This requirement for consideration calculated by discounting the general purchase price for copies of the Novell software suggests a sale from Novell to the OEM.

In the section of the OEM Agreement entitled "End User Satisfaction," it is agreed that Novell "has granted OEM a worldwide license to market and *sell* Novell Products under the terms of the Agreement" but the "OEM agrees that it will not market and *sell* Novell Products in areas where it does not have the ability to support the Novell Products." *Id.* at ¶ 5(c) (emphasis added). The OEM also agrees to "[m]aintain a shipment report identifying the End User or OEM Authorized *Reseller*, the Novell Product *sold*, the date of *sale*, and each Novell Product's serial number" and to retain the shipment reports "for three (3) years after the date of *sale* . . .." *Id.* (emphasis added). This language clearly supports the conclusion that the transaction between Novell and the OEM is a sale.

In the section entitled "Title & Risk of Loss," *title* to Novell Products shipped to United States destinations and *all risk of loss* "will pass to OEM upon delivery . . .." *Id.* at ¶ 6(g). Excluded from the title and risk of loss provision are Novell's trademarks,

)

copyrights, and other intellectual property rights. Not specifically excluded from the title and risk of loss provision are the particular copies transferred from Novell to the OEM.

In the next section of the OEM Agreement, the OEM grants Novell a "purchase money security interest in (i) the Novell Products to be acquired from Novell under the Agreement . . .." *Id.* at ¶ 6(h). This language also indicates that the transaction between Novell and the OEM is a sale. Purchase money security interests are generally granted in connection with sales transactions. *See, e.g., Matter of Hamilton*, 892 F.2d 1230, 1232 n.6 (5th Cir. 1990); *Meyer v. General American Corp.*, 569 P.2d 1094, 1098-99 (Utah 1977).

Novell relies primarily on language in the section entitled "Intellectual Property Rights & Indemnification." That provision of the OEM Agreement states that "[n]o title to or ownership of software acquired under the Agreement or proprietary technology in hardware acquired under the Agreement is transferred to OEM. . . . Novell . . . owns and retains all title and ownership of all ***intellectual property rights*** in the Novell Products, including all software, . . . copies of software . . .. Novell does not transfer any portion of such title and ownership . . . to OEM." OEM Agreement, at ¶ 7(e) (emphasis added).[7]

Construing the OEM Agreement, as it must, in a manner which harmonizes and gives effect to all of the provisions therein, the Court concludes that paragraph 7(e) relates only to Novell's intellectual property rights incorporated into the copies delivered to the OEMs.

---

[7]    In the same section, "OEM agrees not to provide Novell Products or any part or copies thereof to any third party without the prior written consent of Novell." As was true in the *Bobbs-Merrill* case, this provision may contractually obligate the OEM not to transfer the copies except under the circumstances set forth in the OEM Agreement, but it does not preclude the application of the "first sale doctrine" as codified in § 109(a).

11

Under this provision, it is clear that Novell does not transfer title and ownership of the creative work which the copyright protects. As discussed above, however, the "Title & Risk of Loss" provision clearly transfers to the OEMs title to and risk of loss for the particular units or copies that Novell delivers to the OEMs. To interpret the OEM Agreement as a mere license, as suggested by Novell, rather than as a sales contract, would require the Court to ignore all the sales language discussed above. Additionally, in light of the repeated references in the OEM Agreement to sales and resellers, Novell's argument that it did not mean sales and resellers is neither plausible nor reasonable.

The Court, construing the unambiguous OEM Agreement in accordance with Utah law, concludes that the transfer to the OEM of tangible copies of Novell software under the OEM Agreement is a sale of the particular copies, but not of Novell's intellectual property rights in the computer program itself, which is protected by Novell's copyright.

### D.    Conclusion as to Copyright Infringement Claim

With the exception of any counterfeit unit, the first sale doctrine bars Novell's copyright infringement claims against CPU. Although the Court does not hold that parties could not conceivably draft an agreement which would avoid application of the first sale doctrine, Novell's OEM Agreement is not ambiguous and is properly construed as a sales contract. The OEMs, therefore, are owners of the *copies* with contractual obligations to Novell which, if breached, could possibly result in breach of contract claims by Novell.

Novell does not, however, have a copyright infringement claim against CPU except as to the allegedly counterfeit unit.[8]

## IV.   TRADEMARK INFRINGEMENT CLAIMS INVOLVING DISTRIBUTION

A doctrine similar to the first sale doctrine applies in trademark infringement cases. The genuine goods doctrine provides that "trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent." *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 590 (5th Cir. 1993) (citations omitted). Novell argues that the genuine goods doctrine does not apply because Novell did not *sell* its products and, therefore, CPU cannot properly sell Novell's goods, genuine or otherwise. As discussed fully above, Novell's OEM Agreement is a sales contract pursuant to which Novell sells its products to OEMs with contractual obligations on the part of the OEMs.

Novell also argues that the copies sold by CPU are not "genuine" because they do not include access to Novell's technical support. Whether or not this argument is factually sound, a similar argument was presented to and rejected by the Fifth Circuit in *Matrix*. In that case, the trademark holder argued that the Matrix hair care products sold by Emporium, "without the potential for concurrent consultation or supervision by a licensed cosmetologist,

---

[8]   CPU also argues that Novell's copyright claims are barred by the doctrine of copyright misuse, citing *DSC Communications Corp. v. DGI Technology, Inc.*, 81 F.3d 597, 601 (5th Cir. 1996). Although the Court finds CPU's argument on this issue unpersuasive, the Court does not squarely decide the issue; the Court's ruling on the first sale doctrine and the laches defense renders the copyright misuse argument moot for purposes of Novell's copyright claims.

were not 'genuine' products." *Matrix*, 988 F.2d at 591.  The Fifth Circuit rejected Matrix's

argument.

Because Novell sold its products into a distribution chain from which CPU obtained

and resold genuine goods, CPU is entitled to summary judgment on Novell's trademark

infringement claim except as it applies to any counterfeit unit.

## V.     <u>LACHES DEFENSE</u>

"In a legal context, laches may be defined as the neglect or delay in bringing suit to

remedy an alleged wrong, which taken together with lapse of time and other circumstances,

causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co.*

*v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1029 (Fed. Cir. 1992).  To prevail on its

laches defense, a defendant must show that (1) the plaintiff delayed filing suit an

unreasonable and inexcusable length of time after the plaintiff knew or reasonably should

have known of the infringement and (2) the delay caused undue prejudice to the defendant.

*See Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998).  Laches is

"a single defense to a continuing tort up to the time of suit, not a series of individual defenses

which must be proved as to each act of infringement, at least with respect to infringing acts

of the same nature." *Aukerman*, 960 F.2d at 1031.

Federal courts refer to analogous state statutes of limitations to determine whether

there is a presumption that the delay was unreasonable and that undue prejudice resulted.

*See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 812 (7th Cir. 1999) ("courts have used

this analogous limitations period as a baseline for determining whether a presumption of

laches exists").  The statute of limitations for the copyright infringement claims is three

years.  17 U.S.C. § 507(b).  A four-year statute of limitations applies to the trademark infringement claims.  *See Derrick Manufacturing Corp. v. Southwestern Wire Cloth, Inc.,* 934 F. Supp. 796, 805 (S.D. Tex. 1996).  The beginning point is the date the plaintiff "knew or should have known" of the accused use.  *Armco, Inc. v. Armco Burglar Alarm Co., Inc.,* 693 F.2d 1155, 1161 (5th Cir. 1982).  "The objective standard of 'knew or should have known' is a logical implementation of the duty to police one's mark."  *Id.*

CPU argues that Novell knew or reasonably should have known as of March 1992 that CPU was reselling Novell software.[9]  By that date, Novell had received upgrade registration forms reflecting resales by CPU.[10]  *See* Exh. 1 to Harwell Aff., App. I to Defendants' Motion, at 220.  Novell did not, however, file suit at that time.  Novell argues that it received thousands of registration forms during 1992 and cannot be charged with knowledge of the contents of those forms.  The Court disagrees.  The upgrade registration forms identify the reseller of the NetWare products.  One of the purpose of these forms is to identify the purchasers and sellers of the units.  A copyright and trademark owner interested in protecting its rights reasonably should know the contents of forms submitted to that owner which reflect allegedly unauthorized resales.

---

[9]  CPU's laches defense does not address Novell's copyright and trademark infringement claims relating to the alleged counterfeit unit and the Court's ruling does not affect that aspect of Novell's claims.

[10]  Although Novell argues that it received only one upgrade form listing CPU as the reseller, documents produced by Novell indicate that, more than four years before this lawsuit was filed, Novell received approximately 50 upgrade forms listing CPU as the reseller.  *See* App. V to Defendants' Reply, at 7; 74-339.  This putative fact dispute is not material, however, because the receipt of even one copy would impose on Novell a duty of inquiry, as discussed herein.

"[T]he law is well settled that where the question of laches is in issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Wanlass v. General Electric Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998) (quoting *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (1893)). "The [plaintiff] must be diligent and make such inquiry and investigation as the circumstances reasonably suggest, and the means of knowledge are generally equivalent to actual knowledge." *Id.* (quoting *Potash Co. of America v. International Minerals & Chemical Corp.*, 213 F.2d 153, 155 (10th Cir. 1954)). "[T]he law imputes knowledge when opportunity and interest, combined with reasonable care, would necessarily impart it." *Id.* (quoting *Wollensak v. Reiher*, 115 U.S. 96, 99 (1885)). Knowledge is imputed where the records which reflect the violation are available for inspection and the plaintiff failed to review them. *Id.* (citing *Burke v. Smith*, 83 U.S. 390, 401 (1872)).

The Court concludes that Novell reasonably should have known of CPU's allegedly infringing conduct upon receipt of even one registration form reflecting that CPU was reselling Novell software. This conclusion is based in large part on Novell's knowledge at that time that it had not authorized CPU as an authorized reseller combined with Novell's position that resellers who it had not authorized were not "authorized resellers." Novell waited well over five years before suing CPU, beyond both of the analogous statutes of limitations, and the presumption of laches, both unreasonable delay and resulting prejudice, applies.

Novell has failed to present evidence to rebut the presumption. Novell argues that it must prioritize its litigation resources and cannot sue every infringer. The laches period begins when the plaintiff knew or reasonably should have known of infringing conduct, not when the plaintiff knew or reasonably should have known of egregious infringing conduct. Nor are Novell's litigation resources pertinent to this inquiry.

Having failed to rebut the presumption of laches, Novell's copyright and trademark infringement claims (excluding the claims as they relate to the alleged counterfeit unit) are subject to CPU's laches defense. The Court finds no factors which would make it inequitable to apply the laches defense in this case. As a result, the Court exercises its discretion to recognize CPU's laches defense against Novell's trademark and copyright infringement claims.

## VI.    CONTRIBUTORY INFRINGEMENT CLAIM

Novell alleges that Defendants Hunter and Green engaged in contributory trademark and copyright infringement. "A party is liable for contributory infringement when it, 'with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another.'" *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) (citation omitted). "[I]f a manufacturer or distributor intentionally induces another to infringe a trademark, . . . the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit." *Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816, 828 (5th Cir. 1998) (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 853-54 (1982)), *cert. denied*, 526 U.S. 1133 (1999). A finding of

contributory infringement is "dependent upon the existence of direct infringement." *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993).

In this case, to the extent that the Court has held that CPU is not liable for trademark or copyright infringement, the Court also holds that Hunter and Green are not liable for contributory infringement. Except as to the single allegedly counterfeit unit discussed above, Defendants Hunter and Green are entitled to summary judgment on Novell's copyright infringement claim and trademark infringement claim involving distribution of Novell software. Defendants Hunter and Green are also entitled to rely on the laches defense discussed above.

## VII. TRADEMARK INFRINGEMENT (ADVERTISING) AND LANHAM ACT CLAIMS

Novell alleges that CPU's advertising is deceptively misleading in violation of Novell's trademark rights and in violation of the Lanham Act. CPU argues that it was authorized to use Novell's trademarks and that its advertising is not likely to cause confusion. The Court concludes that the existence of genuine issues of material fact on these matters precludes summary judgment.

### A. Authorization to Use Novell's Trademarks

CPU presents evidence which raises a genuine issue of material fact regarding the assertion that Novell authorized CPU to use its trademarks. CPU argues that it was authorized by Novell's OEM, Glacier, L.L.C. ("Glacier"). Glacier was a Novell OEM pursuant to an OEM Agreement authorizing Glacier to use the Novell trademarks in connection with its marketing of bundled products. CPU's evidence indicates that Glacier

was authorized by Novell to distribute the Novell software to Glacier's authorized resellers, and CPU entered into a distribution contract with Glacier pursuant to which Glacier purported to authorize CPU to use the "Glacier and/or Novell Marks applicable to the Products under this Agreement." *See* Standard Distribution Agreement, D'Alessio Exh. 6, App. II to Defendants' Motion, at 276-87. Glacier's Vice President of Sales and Marketing, Lisa Gaudette, testified that Glacier authorized CPU to advertise and sell Novell products, that Glacier reviewed and approved CPU's advertising, and that Novell knew that Glacier distributed Novell's products to CPU. *See* Gaudette Depo. at 76-85, App. I to Defendants' Motion, at 193-96.

CPU's evidence also indicates that it obtained the Novell logo and authorization to use the Novell trademark from Mimi Sabo, a Novell Marketing Programs Manager for OEM sales. Sabo testified candidly that she authorized "for the Novell logos to be delivered to [CPU] via electronic mail." Sabo Depo. at 30, App. I to Defendants' Motion, at 212.

Novell argues that neither Glacier nor Sabo had the authority to permit CPU to use Novell's trademarks. "Actual authority . . . is deemed express if granted in either written or oral specific terms. It is deemed implied if the authority is a necessary or incidental part of the express authority." *Migerobe, Inc. v. Certina USA, Inc.*, 924 F.2d 1330, 1336 (5th Cir. 1991) (citations omitted). "Apparent authority exists when the principal clothes his agent with the semblance of authority such that a reasonably prudent person having knowledge of the business involved would be justified in believing, that the agent has the power the person assumes that he has." *Id.* "[W]hen an agent acts within the scope of this apparent authority,

the acts bind the principal as though the agent actually possessed such authority." *Biggs v. United States Fire Insurance Co.*, 611 S.W.2d 624, 629 (Tex. 1981).

Whether Glacier and/or Sabo had actual or apparent authority to permit CPU to resell Novell software and/or to use Novell's trademarks is a fact issue which must be decided by the trier of fact.[11] CPU's request for summary judgment on these issues is denied.

### B. Likelihood of Confusion

Novell argues that CPU's advertising is false and is likely to cause confusion in violation of the Lanham Act. Novell also alleges that CPU places the Novell mark in close proximity to the words "authorized OEM partner" and, thereby, creates a likelihood that consumers will be confused and will believe that CPU is an authorized OEM or is otherwise authorized by Novell to sell Novell's products.

Likelihood of confusion is determined by considering certain "digits of confusion." *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 543 (5th Cir. 1998). These "digits" include: (1) the type of mark involved; (2) the similarity between the mark and allegedly confusing mark; (3) the similarity between the services provided by the mark owner and the alleged infringer; (4) the manner in which the services or products are marketed; (5) the method of advertising used; (6) the defendant's intent; and (7) any evidence of actual confusion. *Id.* Likelihood of confusion is a fact issue. *Rolex Watch*, 158 F.3d at 829.

---

[11] CPU in its Motion discusses a number of Novell Authorized OEMs from which CPU obtained copies of Novell software for resale. Novell responds that the OEMs only authorized CPU to distribute bundled OEM products. To the extent Novell distinguishes between CPU's right to sell bundled products versus unbundled products, and to the extent the distinction is material, Novell would be entitled to recover, if at all, only upon proof of resales by CPU of unbundled OEM products.

In this case, the precise placement of Novell's trademark in CPU advertising is undisputed. Whether that placement is likely to cause confusion among consumers is a fact issue which must be resolved by the trier of fact, not by the Court on a motion for summary judgment. Accordingly, CPU is not entitled to summary judgment on the Lanham Act claims or on the trademark infringement claims as they relate to CPU's advertising.

## VIII.  UNJUST ENRICHMENT CLAIM

Novell alleges that CPU has misrepresented itself as an authorized Novell distributor and thereby has unjustly profited to Novell's detriment. CPU seeks summary judgment on Novell's unjust enrichment claim because (1) the claim is preempted by the Copyright Act; (2) Novell lacks standing to assert claims for its distributors; and (3) Novell has not presented evidence which raises a genuine issue of material fact in support of the unjust enrichment claim. Initially, the Court notes that CPU did not plead preemption and it is now much too late to amend its answer in a lawsuit that has been pending for almost three years. With reference to the standing issue, Novell agrees that it does not have standing to assert claims on behalf of its distributors. Novell maintains, however, that it is asserting its own unjust enrichment claim based on CPU's false representations and trademark infringement through its advertising.

To establish an unjust enrichment claim under Texas law, the plaintiff must show that the defendant obtained a benefit from the plaintiff by fraud, duress, or undue advantage. *See Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Novell's evidence raises a fact dispute regarding its claim that CPU obtained upgrade products from Novell by misrepresenting itself as an authorized Novell reseller and through the

21

unauthorized use of Novell trademarks. Novell's evidence also creates a fact dispute regarding whether CPU's conduct resulted in its inequitable retention of Novell's profits. *See Harris v. Sentry Title Co.*, 715 F.2d 941, 950 (5th Cir. 1983), *cert. denied*, 469 U.S. 1037 (1984). The existence of a genuine issue of material fact precludes summary judgment on Novell's unjust enrichment claim.

## IX.   CONCLUSION AND ORDER

Based on the foregoing, the Court concludes that the "first sale doctrine" applies to preclude Novell's copyright claims except for the allegation regarding one counterfeit unit. Similarly, the "genuine goods doctrine" precludes Novell's trademark infringement claims based on the distribution of Novell software except as to the allegedly counterfeit unit. The Court also concludes that Novell's copyright and trademark claims are barred by the laches defense. To the extent CPU is entitled to summary judgment on these claims, the individual defendants are similarly entitled to summary judgment on the contributory infringement claims.

Genuine issues of material fact preclude summary judgment on Novell's trademark infringement claim regarding CPU's advertising and on Novell's Lanham Act and unjust enrichment claims. Accordingly, it is hereby

**ORDERED** that Defendants' Motion [Doc. # 102] and Plaintiff's Motion [Doc. # 105] are **GRANTED IN PART AND DENIED IN PART** as set forth herein. It is further

)

**ORDERED** that Novell's Motion for Leave to File Surreply [Doc. # 124] is

**GRANTED**.

SIGNED at Houston, Texas, this _____ day of May, 2000.

NANCY F. ATLAS
UNITED STATES DISTRICT JUDGE